ROBERTSON (UNITED STATES v.). See Case No. 16,174.

ROBERTSON (WARNER v.). See Case No. 17,189.

## Case No. 11,930.

### ROBERTSON v. WELLSVILLE.

[1 Bond, 81.] [2]

Circuit Court, S. D. Ohio. Oct. Term, 1856.

DEDICATION — How ESTABLISHED — FEE—VERBAL DECLARATIONS—PRESUMPTION—EVIDENCE —DEED.

1. To constitute a valid dedication of property to public use, there must be not only an intention to dedicate, but an act manifesting such intention.

2. The law is liberal in its spirit and policy in regard to appropriations of property for a public use, and requires no particular formality to give them validity.

3. A dedication may be established by proof of verbal declarations, or by a written instrument, and, under some circumstances, it may be presumed from a long continued acquiescence of the owner in the use of the property by the public; but such presumption does not arise where such user is by the license of the owner, and not adverse to the title asserted by him.

4. There may be a good dedication of property to a public use, without a divestiture of the fee of the owner.

5. Verbal declarations of the owner, that he had surrendered the control of the landing, or beach of the river, to the municipal authorities of a town, temporarily, and for a reason specified by him, do not import a legal dedication to the public.

6. Evidence of continued claim of title, and the exercise of acts of ownership over the property, by the person claiming title, may be conclusive to rebut a presumption of a dedication to the public.

7. The consent of the owner of land to the construction of a road upon it, for his own and

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Lewis H. Bond, Esq., and here-reprinted by permission.]

the public use, does not make out a valid dedication.

8. Evidence of the execution and contents of a quitclaim deed, alleged to have been executed many years before the commencement of the suit, and which was never put on record, and never heard of or seen by those who might be supposed to be cognizant of it, at the time of its alleged execution, or those officially charged with its custody afterward, should be received with great caution.

[At law. For hearing on a motion to dismiss, see Case No. 11,927.]

H. Stanbery and G. M. Lee, for plaintiff.

H. H. Hunter and J. W. Andrews, for defendant.

CHARGE OF THE COURT. This is an action of ejectment to try the title to a small strip of land lying in front of the town of Wellsville, in Columbiana county, extending north and south, or up and down the Ohio river, from the line of Lisbon street, in said town, to South street, and eastwardly from the east line of Front or Water street, a distance of about one hundred feet. The proof of title by the plaintiff consists of a deed from William Wells and wife to [John W.] Robertson and Rippert, dated May 1, 1847, and a deed from Rippert to the plaintiff, dated April 8, 1851. As both parties claim under Wells, there is no controversy as to his title. The defendant claims the land in dispute, excepting the right of a ferry landing, sixty-six feet in width, at the termination of the road leading from Lisbon street to the river, which, it is admitted, belongs to the plaintiff. It is insisted by the defendant that the title to the land did not pass to Robertson and Rippert by the deed from Wells, for the reason that prior to the date of that deed, he had dedicated it to the public for a wharf or landing. And the question for the decision of the jury is, whether the evidence proves a valid dedication of the land for this public use. In the trial of this issue, it is the province of the court to define and declare what constitutes a legal and effective dedication of real estate to public use, and of the jury to determine from the evidence whether such dedication is proved. The term dedication carries with it its true meaning, and is its own interpreter. To dedicate property to public use, is simply to appropriate, or set it apart to such use. There must be not only an intention to dedicate, but an act manifesting such intention. Hence, an expression of an intention, without some act to effectuate it, does not make a valid dedication. The law, however, as settled by a long course of judicial decisions, is liberal in its spirit and policy in regard to the appropriation of property to public uses. It requires no particular form or solemnity to constitute a valid dedication. In the ordinary transfer of real estate from one individual to another, the law wisely provides that it shall be evidenced by a writing signed by the grantor, and duly acknowledged before some public officer. But this is not necessary in a dedication, which may be by parol; nor is it necessary there should be any grantee named, or any consideration expressed. It may be established either by proof of the verbal declarations of the owner, or of a writing signed by him. And, under some circumstances, it may be presumed without proof of any act of dedication from the acquiescence of the owner in the use and occupation of property by the public. But, usually, such use and occupation must be adverse to the title of the owner to raise a presumption of dedication. Nor is it necessary to be a valid appropriation of property to the use of the public, that the owner should divest himself of the fee of the land. Hence, a grant of the use and occupancy of real estate for public use, without any restriction or limitation as to the duration of the right, is a good dedication, though the fee remains in the grantor. In such case, if the real estate, from any cause, ceases to be occupied for the purpose specified in the grant, it will revert to the owner or his heirs. In this case, it is in evidence that William Wells was the proprietor of a considerable tract of land, bounded on the east by the Ohio river, which included the site of the present town of Wellsville. In the year 1823, he laid out the town, and made a plat, which was duly recorded. The strip of land in controversy was not included in the plat as a part of the town, and it is not claimed that the plat contains any evidence of an appropriation of the land for public purposes.

The defendant, as proof of title by dedication, relies, first, on evidence of the repeated verbal declarations of William Wells that he had granted the strip of land in dispute to the public for the purpose stated; and, second, on proof that he executed a written quitclaim or conveyance to the town of Wellsville, now lost, but the execution and contents of which, it is insisted, are proved by the testimony before the jury. The witnesses proving the statements and declarations of Mr. Wells are numerous—twenty or upward —and it would be useless consumption of time to recite to the jury the testimony of each of these witnesses. I shall therefore merely give a brief summary of their statements. The first witness, called by the defendant, says that in 1823, 1824, and 1825, he was the assessor of property for taxation for the township in which the town of Wellsville is situate; and that in one of those years, when discharging his duties, Wells stated to the witness that he ought not to appraise the strip lying east of Water street, as it belonged to the town for a wharf or boat landing. Another witness testifies that in 1833, or '34, he purchased a lot of Wells, and after the purchase heard him say, he intended the owners of lots in the town to have the benefit of the beach of the river. All the other witnesses examined by the defendant, as to the declarations of Wells, state

conversations had with him in the year 1838, and subsequently. One witness says that in that year he heard Wells say the wharf or landing belonged to the town, and the town ought to keep the road leading to it in repair. Another witness testifies that in 1838, or '39, Wells said in his presence, that the wharf or landing had been a trouble to him, and he had given it up to the town. Two witnesses, who were owners of wharf-boats, state that after 1838 Wells declined taking the pay for wharfage, and referred them to the mayor or town council. Several witnesses testify, in effect, that Wells declared in their presence that he had given the wharf or landing—or, as some say, the control of the wharf or landing—to the council, and did not wish to have any more trouble with it. One witness says the landing or beach from Lisbon street to South street had long been used by the public for the landing of boats, deposits of merchandise, etc., and that he had heard Wells say more than once, that the landing belonged to the public. Another witness swears, that he heard Wells say he did not intend the beach in front of the town to become private property, but intended it for public wharves. Another says, that in 1842, Wells stated he had given the landing to the council, and also testifies that the town had claimed all the ground from Lisbon to South street. A witness also says, Wells declared he had given it to the town, and that it might be worth something some day in helping to pay taxes, etc.

This brief statement of the substance of the evidence in relation to the declarations of Mr. Wells will suffice. It is insisted that they prove a dedication of the beach or landing to the use of the public. The jury will give this evidence such weight as they think it fairly entitled to, in view of all the circumstances of the case. And in weighing it, it will be proper to bear in mind that it relates to conversations which took place many years since, and concerning which, from the infirmity of human memory, there is a liability to mistake and error. If the jury believe that Wells, in his declarations on this subject, had reference merely to a grant to the authorities of the town of the right to control the beach for the purpose of regulating the landing of boats at the wharf, including a right to charge and collect wharfage for the use of the town, they do not prove a valid dedication of the property to the public use. The privilege granted, in that view, was only temporary, and was subject to revocation by Wells at his pleasure. It would seem that prior to 1838, Wells had exercised undisputed control over the beach or landing. In that year the town being desirous of improving the road leading from Lisbon street to the wharf, obtained his consent for that purpose, with the right, it would seem, to collect and receive wharfage. Many of the witnesses state, in connection with their testimony respecting the declara-

tions of Wells, that he gave as a reason for vesting the town with the control of the beach or landing, that he had been greatly annoyed by the boatmen who had obtained privileges from him, and that to get rid of this he had transferred the management of it to the town. This would not seem to justify the conclusion that he had permanently dedicated the beach to the use of the public.

It is also insisted by the counsel for the defendant that the inference of a dedication is strengthened by the fact that in the act incorporating the town of Wellsville, passed in 1833, the strip of land in controversy is included in the limits of the town, as defined in that act, and that it confers on the town council the authority to construct wharves. This can not be held as affecting the title of Wells to the property in question, nor does it afford any just ground for the presumption that he had dedicated it to the public. It is also in evidence, that from the year 1833 the town council exercised jurisdiction over the beach or landing, and at different times enacted ordinances to prevent obstructions there, and to regulate the amount of license to be paid by wharf-boats, etc. This was a jurisdiction properly pertaining to the town authorities for police purposes, but its exercise could not deprive Wells of his right to this property. He could not be divested of this against his own consent, either by the legislature of the state or the town council.

I will now refer briefly to the evidence in connection with the quitclaim or conveyance, alleged to have been executed by Wells to the town of Wellsville, and which is relied on by the defendant to prove the dedication of the property in dispute. The evidence on this point is mainly that of the witness Jenkins. He states, in substance, that in September, 1838, he was a member of the town council, and that the construction of a new road from the end of Lisbon street to the river, including a wharf to facilitate the landing of boats, had been authorized, or was in contemplation. Doubts being intimated in the council as to its title to the road and its authority to make the improvement referred to, the witness says a committee was appointed to wait on Wells and ascertain the condition of the title, and that this committee reported an instrument of writing, signed by Wells, in the nature of a permission by him that the road might be made. This being unsatisfactory, the witness further states that it was proposed in the council that a quitclaim deed should be procured from Wells, and the witness was requested to write it. He wrote one, which he says was copied by another person and put into the hands of the committee. He also says that on the same day the committee presented the quitclaim deed to the council signed by Wells. The witness did not see the paper signed, but was well acquainted with the handwriting of Wells, and says

the signature was genuine. The quitclaim was satisfactory to the council, and was ordered to be recorded. The witness states that he has not seen the paper since. He can not say whether any consideration was set forth in the quitclaim, nor does he remember whether it was acknowledged before any officer. He can not remember how the land was described in the deed, but supposes it included the strip east of Water street, from South street to Little Yellow creek on the north. He thinks there was a reservation of the ferry landing, but is not certain. It is insisted by defendant's counsel that the evidence of Jenkins, in relation to the quitclaim deed, is corroborated by the witness McLaughlin. This witness says that in September, 1847, then being mayor of Wellsville, the plaintiff, Robertson, remonstrated against grading the bank, on what he said was his property, and was included in his purchase from Wells. The witness says he replied to this that Wells had no right to sell it, as he had before given a quitclaim to the town, and that the plaintiff then said Wells had told him of the quitclaim, but that it was lost, and had never been recorded. If the jury believe that a quitclaim was executed by Wells for the land in controversy, prior to the deed of Robertson and Rippert, it did not pass to them by that deed, and the plaintiff's claim of title in this suit necessarily fails. It will be the duty of the jury carefully to consider the evidence as to the execution of the quitclaim, and all the circumstances justifying the presumption that the witness, from failure of memory or other cause, is under a misapprehension as to the facts. The statements of witnesses relating to the execution and contents of the lost instrument, especially after the lapse of many years from the time of the transaction, should be received with great caution. It will also be proper for the jury to bear in mind that the witness Jenkins does not state that he was present at the execution of the quitclaim, but that he saw Wells' signature to it, which he believed to be genuine. It will also occur to the jury as a fact, to some extent irreconcilable with the statements of Jenkins, not only that the quitclaim was never put on record, but that it has never been seen by those who were then members of the council, or by any other persons since intrusted with the books and papers of the council, and that there is no entry or memorandum in the journals noting or referring to such an instrument.

Having thus summarily noticed the material facts in proof in support of the defendant's claim of a dedication of the property, I will briefly refer to the evidence for the plaintiff in rebuttal of this claim. This consists mainly of a series of acts, showing, as contended for by the counsel for the plaintiff, a continued claim to and exercise of ownership over the land in dispute by Wells up to the time of the sale to Robertson and Rippert, in 1847, wholly inconsistent with a previous dedication to the public. This evidence has been admitted by the court as competent, and it will be for the jury to determine what weight shall be given to it. As the witnesses to sustain this position are numerous, I will not detain the jury by reciting minutely the statements of each. It appears from the evidence of a number of these witnesses that in 1844 or 1845, owing to the vexatious annoyance to which he was subjected by the disputes and quarrels among the owners of wood-boats occupying the landing under a permission from Wells, and the difficulty of collecting the money they were to pay for their licenses for this purpose, he agreed that the council should take charge of them and receive the rents, and the places these boats were to occupy were fixed by an arrangement between Wells and the council. George Wells, the son of William Wells, states that prior to this arrangement his father had always collected and received the rents from these boats, and had claimed and exercised the exclusive control over them, and also the wharf, and that no one had questioned his right. All the witnesses on this subject speak of the right given to the council to control the boats as temporary, and not as implying a divestiture of the title of Wells. Several persons, who were members of the town council prior to 1845, say the town did not claim or exercise any control over any part of the landing till after the arrangement made in that year by which Wells transferred to the council the right to regulate and license boats, as before stated.

There are other facts in evidence, which it is insisted by the plaintiff's counsel, strongly negative the presumption of a dedication or grant of the landing for public use. In the first place, it appears that William Wells paid the taxes on the property in dispute till the year 1850. In 1826, he sold to his son, George Wells, a part of the land claimed by the town, lying above Lisbon street, on which he built a house, which remained there till 1849, when it was taken down by him. It is also in evidence that about the year 1826, George Wells, with the knowledge and consent of his father, at his own expense and for his own accommodation, made a road down the bank from the end of Lisbon street to the river, without any question as to his right to do so. It is also proved that when, in 1838, the council authorized a new road to the river, they applied to William Wells for his permission, which they obtained in writing. The evidence also shows that in 1836, William Wells entered into a written article for the sale of the entire tract of land owned by him, including the strip in dispute, to a company in New York, without reference to or reservation of any right in the public to it. This contract was not carried into effect, owing to the failure of the purchasers to

comply with its terms; but it is insisted that the sale by Wells is an act in conflict with the presumption that he had previously dedicated the land to public use. It also appears that in the year 1849, subsequent to the sale to Robertson and Rippert, Wells, as their agent, notified the mayor of Wellsville to desist from grading the bank of the river on the land in controversy, claiming that it was private property, over which the town had no control. The jury will also bear in mind that the deposition of Wells, who is now deceased, taken and used in a case pending in a state court, in which the town of Wellsville was substantially one of the parties, and which involved the precise question arising in this case, has been admitted in evidence. In that deposition he denies having made any grant of the river beach east of Front street to the public use, either by any verbal declaration or by the execution of a written quitclaim or conveyance. He states that the only deed he ever made was that to Robertson and Rippert in 1847, and that the paper which he signed in 1838 was a mere permission to the town council to improve the road from the termination of the street to the river bank.

This is a comprehensive statement of the material facts in evidence. If the jury are satisfied that William Wells, by his verbal declarations or by a quitclaim deed, dedicated the strip of land now claimed by the town of Wellsville to the use of the public, they will find for the defendant, with the exception of the sixty-six feet, extending from the end of Lisbon street, to which the pleadings admit the right of the plaintiff, as a ferry landing. On the other hand, if it shall be the conclusion of the jury that the evidence adduced by the plaintiff, does not prove such a dedication, their verdict will be in his favor.

It is, however, insisted by counsel that if the jury shall find against the town council, on the claim of a dedication of the whole strip with the exception of the ferry landing, their verdict must be against the plaintiff, as to the road leading from Lisbon street to the river. It is argued that the law applicable to the facts in evidence relating to this road, sustains the conclusion that it has been granted to the public as a highway, and that, although the fee remained in Wells, there is a right of user in the public that bars the plaintiff's recovery in this action. The facts as to the construction of this road have been already referred to. There had been a road to the river, made by Wells in 1826. In 1838, from the growth of the town, and the increase of its river business, it became necessary, in the judgment of the council, that it should be improved. It was proposed to extend the road from Lisbon street, giving it a gradual inclination down the river, and to construct a stone wall on the lower side of the road, which could be used at some stages of water for the purposes of a wharf. Being in doubt as to the power of the council to make this improvement, without the authority of Wells, they applied to and obtained from him his written consent to it. The road was accordingly made and has been open to the public from that time. The writing executed by Wells, which is in evidence, expresses merely his consent that the council should make the proposed improvement, and contains no words indicating a purpose of dedicating the road exclusively to the use of the public. As the owner of the beach or landing, with the right, of course, of constructing a wharf for his private benefit, it was obviously the interest of Wells that the road should be made. But the facts do not imply a dedication of the road exclusively to the public use. On the contrary, the legal inference from the facts is, that there was a mere license by Wells to the public to use the road, in common with himself, subject, however, to his control as the owner of the soil. It is clear that, under these circumstances, the mere use of the road by the public, for any length of time, could not deprive the owner of the soil of his title or his right to its control as his private property. The use not being adverse to Wells, but by his permission, can not be construed as equivalent to a dedication.

The jury returned a general verdict for the plaintiff.

NOTE. The foregoing case was commenced prior to the division of the state in 1855 into two judicial districts, and transferred to the Southern district for trial.